# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

  v.                                                                 **Case No. 09-CR-108**

**CARY NELSON**
        **Defendant.**

## DECISION AND ORDER

Defendant Cary Nelson, charged with possessing unregistered machine guns, see 26 U.S.C. § 5861(d), moved to suppress a statement he made to ATF agents Michael Simonis and John Grady on March 12, 2009 following a polygraph examination. In the original motion, defendant claimed that he made the statement while in custody and absent the provision of Miranda warnings, and that the statement was involuntary. (R. 7 at 2.)

The government responded that defendant was not in custody at the time he made the statement and, in any event, had been provided warnings. The government submitted two documents – a "Polygraph Examination Statement of Consent" and an "Advice of Rights and Waiver" form, both signed by defendant on March 12, 2009 – memorializing the provision of Miranda warnings. (R. 8 Ex. 2 & 3.) The government further provided a copy of defendant's written statement, in which he indicated that he was not under arrest and was free to leave. (R. 8 Ex. 4.)

In an affidavit filed in reply, defendant admitted that he voluntarily signed the polygraph consent form but averred that he signed the advice of rights form and made the incriminating statement only after Grady threatened him. Defendant further averred that, immediately after

taking the polygraph, it became clear based on Grady's demeanor and statements that he was not free to leave. (R. 9 attachment 1.)

The magistrate judge handling pre-trial proceedings in this case held an evidentiary hearing, at which Simonis, Grady and defendant testified. In summary, the agents testified that defendant voluntarily came to ATF offices on March 12, signed the polygraph consent and advice of rights forms, and agreed to a polygraph exam. Grady concluded that defendant had been untruthful during the exam and told defendant as much, after which defendant admitted that he knew the firearms fired automatically.[1] Defendant then provided the inculpatory statement, which Simonis reduced to writing. The agents denied threatening defendant in order to procure the statement. In his testimony, defendant admitted that he was read his rights prior to making the statement but claimed that Grady coerced the admission by threatening him.

In his post-hearing brief, defendant abandoned the Miranda claim but continued to argue that the statement was involuntary. (R. 14 at 1-2.) The magistrate judge adopted the agents' version of events over defendant's and issued a report and recommendation that the motion be denied. (R. 17.) Defendant timely objects, requiring me to review the matter de novo. See Fed. R. Crim. P. 59(b)(3). De novo review does not require a de novo evidentiary hearing, even when witness credibility is at issue. See United States v. Raddatz, 447 U.S. 667, 673-76 (1980). Neither side requests a new hearing, and I find the record made before the magistrate judge sufficient to conduct de novo review.

---

[1] In order to establish a violation of § 5861(d) in this case, the government must prove that defendant knew that the firearms fired automatically. See Staples v. United States, 511 U.S. 600, 602 (1994).

2

## I. FACTS

In January of 2009, employees of a local gun store contacted Simonis and indicated that defendant had brought in for some work two firearms, which the employees found to be fully automatic machine guns. (July 8, 2009 Evid. Hr'g Tr. at 4-5; 30-31.) Simonis examined the guns, observed them to fire as machine guns, and thus seized them. (Id. at 6.) On January 8, 2009, Simonis interviewed defendant at defendant's residence, and defendant consented to a search of his home, pursuant to which agents seized two partially completed automatic firearms, additional parts to build such firearms, and three computers. (Id. at 8-9; 31-32; 85-86; Govt.'s Ex. 1.) Defendant also showed the officers other firearms he possessed. (Tr. at 8.) Defendant told the agents that he assembled the firearms seized from the gun store to be semi-automatic, and that he did not intend to make them fully automatic machine guns. (Id. at 11; 33; 88.) The agents left without arresting defendant. (Id. at 12.)

On January 19, Simonis called defendant to ask for a power cord to check one of the computers and to return the other two, which had already been examined. (Id. at 13; 88-89.) Defendant came to ATF offices to provide the cord and retrieve the computers. Simonis asked defendant if there was anything about his previous statement he wanted to change, and defendant responded that he told the truth and did not want to change the statement. Simonis asked defendant if he would take a polygraph examination, and defendant agreed. (Id. at 14.) Simonis arranged for Agent Grady to conduct the exam on March 12. (Id. at 15-16.)

Defendant arrived at ATF offices at about 1:00 p.m. on that day. Simonis met defendant at the elevators and escorted him to the interview site, a large conference room accessible from a public hallway, and introduced him to Grady. (Id. at 16-17; 19.) Simonis then left, leaving the door unlocked. (Id. at 46.)

3

Grady testified that after Simonis introduced them, defendant agreed to the exam and signed the polygraph consent and Miranda warning forms. (Id. at 54-56.) The polygraph consent form indicated that defendant voluntarily consented to the exam, that he was in good mental and physical condition, that he understood that the questions to be asked would be reviewed with him prior to the exam, and that he understood he could stop the interview and exam at any time. (Govt.'s Ex. 2.) The advice of rights form contained the Miranda warnings, followed by a statement indicating that defendant understood the rights, was willing to answer questions without a lawyer, and that no promises, threats, pressure or force had been used against him. (Govt.'s Ex. 3.) Grady indicated that anyone administered a polygraph by the ATF is provided Miranda rights, even if he is not in custody. (Tr. at 57.)

Grady testified that the preliminary phase of the exam lasted a little over an hour, after which he proceeded with substantive questioning focusing on defendant's knowledge of the automatic firing capability of the firearms. (Id. at 58-61.) The substantive portion lasted about twenty minutes. (Id. at 61.) Grady concluded that defendant failed the exam and advised defendant that the polygraph indicated he was not truthful.[2] (Id. at 61-62.) Defendant did not immediately admit that he had been untruthful, but after further discussion admitted that he made the guns to be fully automatic. (Id. at 62-63.) The two then spoke further about how defendant did that, and defendant indicated that the guns were for his own personal use and he did not intend to sell them. (Id. at 64.) This post-exam questioning lasted about twenty

---

[2]Grady testified that he asked defendant (1) whether he altered the weapons to make them fully automatic, (2) whether he sold the weapons as fully automatic, and (3) whether he knowingly left parts off the weapons to make them automatic. Defendant answered "no" to all three questions, and Grady apparently determined he was untruthful regarding the first and third. (Id. at 74-76.)

4

minutes. (Id. at 77.)

At about 3:30 p.m., Grady advised Simonis that they had completed the polygraph, that defendant had not been truthful during the exam but then started to admit the truth, and that further questioning was advisable. (Id. at 17; 64.) Simonis walked over to the conference room, Grady reiterated what defendant had said, and Simonis then interviewed defendant. (Id. at 18-19; 65.) Simonis first advised defendant that he was not under arrest, was free to leave, did not have to answer questions, and would be leaving the office after the interview. Defendant stated that he understood. (Id. at 18-19; 65.)

The substance of this interview again focused on whether defendant knew that the firearms seized from the gun store fired automatically. Defendant stated that he learned from an internet site how to assemble the firearms so they would function as machine guns and admitted that his earlier statements to the contrary were not true. (Id. at 20.) Defendant specifically indicated that he learned that if, when he assembled the firearms, he did not put in a "disconnector" spring (or used a faulty spring) the disconnector (which prevents automatic firing) would not function.[3] Simonis reduced defendant's statement to writing as it was made, allowed defendant to review the statement, and defendant, Simonis and Grady all signed it. (Id. at 21-23; 37; 40-41; 66; Govt.'s Ex. 4.) The statement began at 3:26 p.m. and ended at 4:01 p.m. (Tr. at 23.)

Simonis told defendant that the matter would be referred to the U.S. Attorney's Office for possible charges and, because of that, he wanted to retrieve the other firearms defendant

---

[3] Simonis testified that prior to the March 12 interview he sent the weapons seized from the gun store to ATF experts in Virginia, who determined that the guns fired automatically because the disconnector spring was not installed. (Id. at 41-44.)

5

had at his residence. (Id. at 25.) Defendant agreed, and Simonis and another agent traveled to defendant's house in one vehicle, while defendant drove himself in his own car. (Id. at 26.) They met in front of defendant's residence, and defendant directed the agents to and opened his gun safes, allowing the agents to take the weapons. Defendant assisted Simonis carry a heavy box out to his car. (Id. at 27.) Simonis did not arrest defendant but rather advised defendant that the matter would be reviewed; because of his cooperation, if charges were filed, Simonis indicated that defendant would be issued a summons rather than arrested on a warrant. Defendant thanked Simonis and shook his hand. (Id. at 28.)

Simonis denied that he or Grady threatened defendant. (Id. at 46.) Grady also denied threatening defendant, using any profanities when he advised defendant that he had failed the exam, or telling defendant that things could be worse for him if he did not change his statement. (Id. at 78.)

Defendant, age thirty, a high school graduate and employed as a machine operator, testified that he had not previously been arrested, spent time in custody or been interrogated by police. (Id. at 83-84; 139-40.) His testimony tracked that of the law enforcement officers regarding the first two encounters, but diverged regarding the March 12 interview. (Id. at 84-91.)

Defendant testified that he did not consider hiring a lawyer prior to the March 12 interview because he did not do anything wrong and believed that the polygraph would clear him. (Id. at 93.) He testified that Simonis met him at the elevators, escorted him to the conference room, introduced him to Grady, then left. Defendant testified that he was very nervous at that point. (Id. at 94-95.) He stated that Grady's initial demeanor was very nice and friendly. Defendant admitted that he signed the polygraph consent form and the advice of

6

rights form at the outset of the examination, and that the contrary statement in his affidavit was incorrect. (Id. at 98-99; 112-14.)

Defendant stated that Grady remained friendly during the polygraph exam but that his demeanor changed after the exam ended. (Id. at 99-100.) According to defendant, at that point Grady told him he "was a fucking liar, that [he] failed the polygraph, and that everything [he] had told him was bullshit." (Id. at 100-01.) Defendant testified that he became extremely nervous, shocked by Grady's behavior. Defendant stated that Grady raised his voice and stood over him, telling him he knew defendant was lying. Grady told defendant to stop screwing with him, that he was going to re-interview defendant, and that it was in his best interest to admit building the firearms. (Id. at 101.) Grady stated that if defendant did not sign a statement saying he made the guns Grady would make sure the case would go before a judge, the judge would believe him as a federal officer, he would do everything in his power to make sure defendant went to jail, and that defendant "would be somebody's bitch in jail." (Id. at 102.) Defendant said that at that point he was very nervous, confused, and tired because he had worked third shift. Defendant also testified that after Grady's demeanor changed he did not feel like he was free to leave. (Id. at 102.) Defendant stated that Grady told him that if he did sign the statement he would talk to the "Attorney General and recommend that no charges be brought," only a "stiff warning." (Id. at 103.) Grady said that if defendant signed the statement, he would do everything to make sure defendant did not go to jail, but if he refused Grady would make sure he did go to jail. (Id. at 103.)

Defendant testified that Grady then left the room for about ten minutes and returned with Simonis. (Id. at 104.) Grady then told Simonis that defendant admitted building the weapons to fire automatically, and that was what defendant was going to sign to. Defendant stated that

7

at that point he still felt very threatened by Grady, who stood next to and over him. (Id. at 105.) Defendant testified that Simonis made no threats during this portion of the interview, but at one point, when defendant said he did not know the weapons were automatic when he dropped them off at the gun store, Grady "butted in right away and said here we go again with this bullshit story." (Id. at 106.) Feeling he had no other option, defendant then told Simonis that he took them to the store knowing they were automatic. (Id. at 106.) Defendant testified that Simonis wrote the statement as Grady (not defendant) was talking. Defendant mostly sat there. (Id. at 115.) At the end of the statement, defendant wrote: "This is the truth." (Id. at 127; Govt.'s Ex. 4), but he testified that Grady insisted that he put that down (Tr. at 127).

## II. DISCUSSION

A.  **Applicable Legal Standard**

A confession is voluntary if, under the totality of circumstances, it is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will. See, e.g., Pole v. Randolph, 570 F.3d 922, 941 (7th Cir. 2009); United States v. Montgomery, 555 F.3d 623, 631-32 (7th Cir.), cert. denied, 129 S. Ct. 2413 (2009). Among the factors relevant to determining whether a confession is voluntary are the defendant's age, intelligence, education and mental state; the inclusion of advice about constitutional rights; the length and nature of the interrogation; the conduct of the law enforcement officers involved; and the use of any physical punishment, including deprivation of food or sleep. See, e.g., Montgomery, 555 F.3d at 632; United States v. Ross, 510 F.3d 702, 709 (7th Cir. 2007), cert. denied, 128 S. Ct. 2099 (2008). Although a defendant's personal characteristics are relevant, the court cannot find a

8

confession involuntary based solely on such characteristics; rather, a finding that the police engaged in coercive activity is a necessary predicate to finding that a suspect's confession was involuntary. Montgomery, 555 F.3d at 632 (citing Colorado v. Connelly, 479 U.S. 157, 167 (1986)).

**B.     Analysis**

It is (now) undisputed that defendant voluntarily traveled to ATF offices on March 12, consented to the interview and polygraph exam, and waived his Miranda rights. Nevertheless, defendant argues that Grady's threats rendered his inculpatory statement involuntary. The magistrate judge rejected these contentions, as do I.

I find the agents' testimony that defendant was not mistreated more credible than defendant's. Simonis and Grady both testified that they did not threaten defendant. Grady denied using profanities in confronting defendant with the results of the polygraph, and Simonis confirmed that Grady did not threaten defendant after he (Simonis) returned to the conference room.[4] Given the overall tenor of defendant's interactions with law enforcement, the agents' version simply makes more sense. Defendant cooperated with the agents from the outset of this investigation, as set forth above, and his cooperation continued even after the alleged threats. Simonis testified, without contradiction, that after the March 12 interview defendant met agents at his house and voluntarily turned over his guns, even assisting Simonis

---

[4] In his objections, defendant claims that the agents' testimony conflicted as to how the statement was reduced to writing, but I see no meaningful contradiction. (Tr. at 21-22; 66.) Defendant also notes Grady's testimony that he usually has the suspect write the statement (Id. at 66), but in this case he had Simonis write it. Different officers use different techniques, and as this was Simonis's case, not Grady's, it makes sense that Simonis would determine the method of memorializing the statement. Further, there is no evidence that Grady directed Simonis in the manner in which the statement would be recorded.

9

carry a heavy box from the house. At the conclusion of the encounter that day, defendant shook Simonis's hand and thanked him. (Tr. at 26-28.) It seems quite unlikely that defendant would have continued in this mode had he been threatened in the crude manner to which he testified.

The record contains no evidence that the agents would be motivated to behave in the manner alleged – and commit perjury before this court – in order to see defendant convicted. Grady's role in this case was confined to conducting the polygraph; he was not otherwise involved in the investigation and thus had little incentive to threaten defendant.[5] Nor had Grady previously worked with Simonis, such that it is plausible they had devised some good cop/bad copy routine. Neither officer knew of defendant before this case. And Simonis, the lead agent on the case, by all accounts treated defendant well and kept his word.[6]

Defendant's testimony, on the other hand, had problems. First, his claims as to what happened on March 12 have changed over time. In the original motion, defendant alleged that he was not advised of his Miranda rights. After the government provided signed copies of the polygraph consent and advice of rights forms, defendant filed an affidavit in which he indicated that he signed the advice of rights form due to Grady's threats. But in his testimony during the hearing, defendant admitted that he signed the form at the outset of the interview – prior to

---

[5]In his objections, defendant argues that it is doubtful Grady would calmly advise defendant that he failed to the exam. But nothing in the record supports the notion that Grady would advise defendant of his polygraph failure in the crude, over the top manner defendant claims.

[6]Defendant characterizes as too good to be true the match between his alleged inculpatory statement about the disconnector spring and the Virginia report determining that the weapons fired automatically based on the absence of the spring. The argument seems to be that the agents contrived the statement to match the report. The record contains no evidence supporting this claim.

10

Grady's alleged threats. Second, as did the magistrate judge, I find odd defendant's claim that Grady promised to speak to the "Attorney General" on his behalf if he confessed. An experienced federal agent like Grady would not speak in such a manner.[7]

Setting aside the alleged threats, there is no coercion in this case. Merely advising a defendant that he failed a polygraph does not amount to coercion. Johnson v. Pollard, 559 F.3d 746, 754 (7th Cir. 2009). Nor do assurances that an officer will advise the prosecutor or court of a defendant's cooperation render a statement involuntary. See, e.g., United States v. Walker, 272 F.3d 407, 412 (7th Cir. 2001).[8]

Finally, defendant was not particularly vulnerable to coercion. Although he lacked prior experience with the police, he was a man of thirty years, a high school graduate, with no apparent mental or physical defects. Defendant testified that he was nervous and tired, but nothing in the record supports the notion that his physical or emotional condition at the time was such that he could not exercise a rational intellect and free will. In any event, as described above, the agents engaged in no tactics designed to take advantage of defendant's fatigue or nerves. The entire interview lasted just a few hours and occurred in a well appointed conference room. Defendant was not in any way restrained and was repeatedly advised that he was free to leave.[9] For these reasons and those stated by the magistrate judge, the motion

---

[7] In his objections, defendant argues that nothing in his testimony provides cause for disbelief. However, he does not address the discrepancies noted in the text.

[8] Like the magistrate judge, I reject defendant's version of what Grady told him about the benefits of cooperation and credit Grady's testimony that he did not tell defendant things would be worse for him if he did not confess.

[9] Although he now concedes that the agents provided Miranda warnings, defendant continues to argue that he was in custody at the time he made the inculpatory statement. I reject this contention. As discussed above, defendant voluntarily came to ATF offices; he was

11

to suppress must be denied.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 17) is adopted, and defendant's motion to suppress (R. 7) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 10th day of October, 2009.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

told at several points that he was not under arrest, was free to leave and would be going home that day; he was at no point restrained, physically handled or deprived of items he needed to go on his way; and he was not subjected to coercive or threatening conduct by the agents. The circumstances of this interrogation closely mirror those in United States v. Budd, 549 F.3d 1140, 1145-46 (7th Cir. 2008), cert. denied, 129 S. Ct. 2030 (2009), where the court found that the defendant not in custody where he agreed to meet the police for questioning at the station, was told that the interview was voluntary, that he could leave at any time, and that he was not going to be arrested on that date. As in the present case, the questioning there occurred in a "soft" interview room.